# United States Court of Appeals for the Federal Circuit

---

**A.L.M. HOLDING COMPANY, ERGON ASPHALT & EMULSIONS, INC.,**
*Plaintiffs-Appellants*

**v.**

**ZYDEX INDUSTRIES PRIVATE LTD., ZYDEX INC.,**
*Defendants-Appellees*

---

2025-1317

---

Appeal from the United States District Court for the District of Delaware in No. 1:24-cv-00363-JPM, Judge Jon P. McCalla.

---

Decided: May 19, 2026

---

JOSEPH DIEDRICH, Husch Blackwell LLP, Washington, DC, argued for plaintiffs-appellants. Also represented by JEFFER ALI, Minneapolis, MN; STEPHEN REID HOWE, Milwaukee, WI.

EDWARD TULIN, Gish PLLC, New York, NY, argued for defendants-appellees. Also represented by RAYMOND JOHNSON BILDERBECK, ANDREW GISH, CONOR MCDONOUGH.

---

Before CHEN, CUNNINGHAM, and STARK, *Circuit Judges.*

CHEN, *Circuit Judge*.

A.L.M. Holding Company (A.L.M.) and Ergon Asphalt & Emulsions, Inc. (Ergon) (collectively, Plaintiff) appeal from a decision of the United States District Court for the District of Delaware dismissing their patent infringement suit against Zydex Industries Private Ltd. and Zydex Inc. (collectively, Defendant) for lack of constitutional standing. *A.L.M. Holding Co. v. Zydex Indus. Priv. Ltd.*, No. 1:24-cv-00363-JPM, 2024 WL 5276676, at *1 (D. Del. Nov. 25, 2024) (*Decision*). Prior to filing suit, Plaintiff licensed several rights under the asserted patents to an exclusive licensee but retained others, including the right to sue third parties for patent infringement, a right that was not rendered illusory by the rights granted to the licensee. Because Plaintiff retained an exclusionary right sufficient to satisfy the "irreducible constitutional minimum of standing," we *reverse* and *remand*.

BACKGROUND

A. The Patent License Agreement

A.L.M. and Ergon are joint owners of the six patents-in-suit, which relate to warm-mix asphalt paving methods and compositions.[1]

On January 1, 2008, Plaintiff entered into an agreement (the Agreement) licensing certain rights in the Asserted Patents to MeadWestvaco Corporation (MWV), a manufacturer and seller of asphalt additives. In 2015, after a corporate merger and reformation, Ingevity Corporation (Ingevity) replaced MWV as the licensee.

Under the Agreement, Plaintiff granted Ingevity an "exclusive," "royalty-bearing, worldwide license" to

---

[1] The patents-in-suit are U.S. Patent Nos. 7,815,725; 7,981,466; 9,394,652; 10,214,646; 8,734,581; and 9,175,446 (collectively, Asserted Patents).

"manufacture, have manufactured, import, use, sell, offer to sell and otherwise commercialize Licensed Products." J.A. 81, ¶ 2.1.  If Ingevity fails to pay Plaintiff guaranteed "minimum annual royalty amounts," then the "license shall become non-exclusive." *Id.*; *see id.* at 83–84, ¶ 3.1; *id.* at 85, ¶ 3.4.

In the event of any third-party patent infringement, the Agreement provides for shared control of any infringement suit between Plaintiff and Ingevity.  "If any unlicensed third party" practices the patents, then Plaintiff and Ingevity "shall mutually determine whether to pursue such infringement."  *Id.* at 87, ¶ 5.1.  If the parties decide to jointly pursue legal action, then they "split 50:50" both the costs and damages recovered.  *Id.*  If either party elects not to pursue infringement, the other party may bring suit independently.  *Id.* ¶ 5.2.  When a single party prosecutes infringement, that party "will control the conduct of the legal action, keep the non-initiating Party advised of its progress, and will retain for itself any damages recovered or obtained in the legal action."  *Id.*

The Agreement also limits Ingevity's ability to transfer its rights.  Before Ingevity may sublicense patent rights, it must "provide[] the terms and conditions of any such sublicense" to Plaintiff "for their prior review and approval" which "shall not be unreasonably withheld."  *Id.* at 81, ¶ 2.3.  "Sales made by a sublicensee shall be reported and royalty paid to [Plaintiff] as if [Ingevity] had made such sale."  *Id.*  The Agreement also provides that "[t]he obligations in this Agreement shall be binding on any sublicensee as if it were a Party hereto."  *Id.*

Likewise, before making any assignment under the Agreement, Ingevity must obtain "written permission" from Plaintiff, "not to be unreasonably withheld."  *Id.* at 93, ¶ 11.4.  This right "otherwise may only be assigned" in certain particularized circumstances, such as "in connection

with the transfer of substantially all of" a party's "assets." *Id.*

Notwithstanding Ingevity's exclusive license and right to sublicense, Plaintiff retained a royalty-free right to (a) make, import, and use licensed products and paving mixtures under the patents for research and development purposes, and (b) to make, import, use, sell and offer to sell paving mixtures containing licensed products purchased from Ingevity. *Id.* at 81–82, ¶¶ 2.1, 2.4. Plaintiff retained the royalty-free right to sublicense to their affiliates the rights they themselves retained in Agreement ¶ 2.4. *Id.*

The Agreement provides Plaintiff with the right to terminate the Agreement based on any material breach by Ingevity, subject to notice and three months to cure any such breach. *Id.* at 90, ¶ 9.3. In addition, Plaintiff maintains control of any continuing patent prosecution and assumed the obligation to pay maintenance fees on the patents-in-suit. *Id.* at 87, ¶ 4.3.

### B. District Court Litigation

On March 21, 2024, Plaintiff filed this action against Defendant, alleging infringement of the six Asserted Patents. *See* J.A. 16–68. Defendant filed a motion to dismiss solely for lack of Article III standing.

Upon reviewing the different provisions of the Agreement, the district court concluded that Plaintiff lacked constitutional standing to pursue the infringement suit and granted Defendant's motion to dismiss. *Decision*, 2024 WL 5276676, at *8. The district court first determined that Plaintiff's reserved usage rights and ability to review sublicensing terms under the Agreement ¶¶ 2.1, 2.3, and 2.4 were not exclusionary rights. *Id.* at *3–5. Similarly, it concluded that Plaintiff's royalty rights did not confer constitutional standing. *Id.* at *5.

The district court next determined that Plaintiff's right to sue was not an exclusionary right sufficient to establish

Article III standing. *Id*. at *6–7. In doing so, the district court relied heavily on this court's decision in *Morrow v. Microsoft Corp.*, 499 F.3d 1332 (Fed. Cir. 2007), where we held that a plaintiff's contractual right to sue for infringement—separated from all other patent rights—did not confer an exclusionary right sufficient for constitutional standing. 499 F.3d at 1342–43; *Decision*, 2024 WL 5276676, at *6. The district court also relied on *Deere & Co. v. Kinze Manufacturing, Inc.*, 683 F. Supp. 3d 904 (S.D. Iowa 2023), which similarly held that a patent owner's retained right to sue was not an exclusionary right conferring constitutional standing. 683 F. Supp. 3d at 920–21; *Decision*, 2024 WL 5276676, at *6.

The district court then determined that Plaintiff's ability to collect damages and terminate the Agreement were likewise insufficient to establish constitutional standing. *Id*. at *7–8. Thus, because it determined that Plaintiff did not have Article III standing, the district court dismissed the action without prejudice. *Id*. at *8.

Plaintiff timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## STANDARD OF REVIEW

We review Article III standing determinations de novo. *Intell. Tech LLC v. Zebra Techs. Corp.*, 101 F.4th 807, 813 (Fed. Cir. 2024). In interpreting a contract, we generally apply state law to determine "who owns the patent rights and on what terms." *Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 841 (Fed. Cir. 2009) (citation and internal quotation marks omitted). The Agreement is governed by Wisconsin law, J.A. 91, ¶ 10.1, which requires that "[w]here the terms of a contract are clear and unambiguous, we construe the contract according to its literal terms." *Tufail v. Midwest Hosp., LLC*, 833 N.W.2d 586, 592 (Wis. 2013). We review the district court's interpretation of a contract de novo. *Aeroground, Inc. v. CenterPoint Props. Tr.*, 738 F.3d 810, 813 (7th Cir.

6    A.L.M. HOLDING COMPANY v. ZYDEX INDUSTRIES PRIVATE LTD.

2013) (citation omitted); *see also Mutakaber v. Sec'y of State*, 162 F.4th 1141, 1146 (Fed. Cir. 2025) ("Contractual interpretation is a pure legal issue." (citation and internal quotation marks omitted)).

## DISCUSSION

Article III standing requires the plaintiff to establish the "irreducible constitutional minimum of standing": (1) injury in fact; (2) causation; and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). In this appeal, the parties dispute only the first requirement—injury in fact—which requires an "actual or imminent," "concrete and particularized" "invasion of a legally protected interest." *Id.* at 560. That requirement must exist at the inception of the suit and persist throughout the litigation. *Zebra Techs.*, 101 F.4th at 813.

For patent infringement lawsuits, in general, the question for the constitutional injury-in-fact inquiry is "whether a party has *an* exclusionary right." *Id.* at 814 (emphasis in original). "A patent owner has exclusionary rights as a baseline matter unless it has transferred all exclusionary rights away." *Id.* at 816. "As we explained in *Morrow*, 'exclusionary rights' involve the ability to exclude others from practicing an invention or to 'forgive activities that would normally be prohibited under the patent statutes.'" *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1234 (Fed. Cir. 2019) (quoting *Morrow*, 499 F.3d at 1342). This court, however, has not "enumerate[d] the exclusionary rights afforded by a patent or fully define[d] their scope." *Zebra Techs.*, 101 F.4th at 816.

The Article III inquiry is distinct from the separate question of statutory standing under 35 U.S.C. § 281. *See id.* at 814. Article III asks whether the plaintiff has suffered a constitutionally cognizable injury, while Section 281 asks whether the plaintiff qualifies as a "patentee" entitled to sue for infringement—typically by determining whether, in the case of a patent owner, it has transferred

away, or in the case of a licensee, it has been transferred "all substantial rights"[2] in the asserted patents. *Lone Star*, 925 F.3d at 1229. Following the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), we "clarified that so-called 'statutory standing' defects do not implicate a court's subject-matter jurisdiction." *Lone Star*, 925 F.3d at 1235 (citing *Lexmark*, 572 U.S. at 128 n.4). The distinction therefore matters: constitutional standing "is a jurisdictional requirement" that is "incurable if absent at the initiation of suit," whereas a statutory standing defect is "curable by joinder." *Zebra Techs.*, 101 F.4th at 814 (citations omitted).

Accordingly, a plaintiff may have constitutional standing without satisfying the additional statutory requirement of possessing "all substantial rights." *See, e.g.*, *Lone Star*, 925 F.3d at 1236 (explaining that although the purported assignee plaintiff lacked all substantial rights required under § 281, its allegations still satisfied Article III); *Univ. of S. Fla. Rsch. Found., Inc. v. Fujifilm Med. Sys.*

---

[2]    We dealt with the concept of "all substantial rights" in *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, where, following the Supreme Court's decisions in *Waterman v. Mackenzie*, 138 U.S. 252 (1891) and *Nicolson Pavement Co. v. Jenkins*, 81 U.S. 452 (1871)—which elucidated the distinction between a license and an assignment and their effect on a party's right to sue under a patent—we stated the need to "examine whether the agreements transferred all substantial rights to the . . . patent and whether the surrounding circumstances indicated an intent to do so." *Vaupel*, 944 F.2d 870, 874 (Fed. Cir. 1991). Thus, the concept of "all substantial rights" relates to what is or may be transferred rather than what a patent owner has, as it starts with all rights.

*U.S.A., Inc.*, 19 F.4th 1315, 1324 (Fed. Cir. 2021) (same for sublicensee).

We have acknowledged that our standing jurisprudence has not always been clear, thereby creating a challenge for district courts applying our precedent. Before *Lone Star*, "many of this court's opinions had improperly melded the injury-in-fact inquiry with the § 281 inquiry—often performing a combined analysis of the two simultaneously." *Zebra Techs.*, 101 F.4th at 814. Our prior lack of delineation, at times, has led to uncertainty as to whether a party has Article III standing to sue for patent infringement where the patent rights have been divided through licensing agreements, such as the one at issue here. In attempting to reconcile our precedents, some district courts have drawn a bright line between our cases addressing constitutional standing and those addressing statutory standing, concluding that cases addressing one side of that line have little, if any, relevance to cases on the other side. *See, e.g.*, *Decision*, 2024 WL 5276676, at *7 & n.5; *Recor Med., Inc. v. Medtronic Ir. Mfg. Unlimited Co.*, No. 22-cv-03072-TLT, 2025 WL 2272414, at *5–6 (N.D. Cal. July 7, 2025). But, although the two standing inquiries are distinct, the same facts bearing on whether a patent owner has granted "all substantial rights" to a licensee to enable the licensee to have statutory standing may also bear on whether the owner retained "an exclusionary right" sufficient for constitutional standing. *See Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1343–44 (Fed. Cir. 2014) (applying a combined analysis and finding a patent owner lacked an exclusionary right because it transferred away all substantial rights), *vacated on other grounds*, 575 U.S. 959 (2015). Thus, the two factual analyses can overlap.

Accordingly, cases analyzing statutory standing can be instructive for constitutional standing. For example, in *Zebra Technologies*, this court expressly cited with approval *Alfred E. Mann Foundation for Scientific Research v. Cochlear Corp.*, a statutory standing case, in its analysis

determining that the plaintiff patent owner there had constitutional standing. *Zebra Techs.*, 101 F.4th at 816 (citing *Mann*, 604 F.3d 1354, 1361 (Fed. Cir. 2010)). In doing so, we characterized *Mann* as "concluding that the patent owner had not transferred away all rights, even under an exclusive license with rights to sublicense, where the patent owner retained the right to sue." *Id.* Thus, whether a licensee's granted rights can be used to nullify the patent owner's right to sue is a question that may arise under both § 281 and Article III standing inquiries, and *Mann*'s answer to that question is therefore instructive here regardless of the doctrinal label under which it was decided.

In particular, *Mann* explains why a patent owner's retained right to sue is not illusory[3] where the patent owner maintains meaningful control over enforcement and no other party has the ability to interfere with that enforcement right. 604 F.3d at 1361–63. Although satisfying the "all substantial rights" test under the statutory standing inquiry addressed in *Mann* requires a totality assessment of all rights retained and transferred, *see Mann*, 604 F.3d at 1360–61, the factual reasoning courts apply within that analysis—such as whether a licensee's granted rights render the patent owner's retained right to sue illusory—is relevant to the Article III question of whether the patent owner retains a concrete, non-illusory exclusionary interest. That shared factual reasoning, not any equivalence of the overall legal standards for constitutional and statutory standing, makes *Mann* instructive here.

---

[3] A patent owner's right to sue would be illusory, for example, when its licensee could effectively extinguish it unilaterally by granting a royalty-free sublicense to an accused infringer, without needing the patent owner's consent. *See Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1251 (Fed. Cir. 2000).

We now turn to the present appeal.  Plaintiff argues that their retained rights as patent owner—including the right to sue, sublicensing control, and royalty interests—are collectively sufficient to establish that they retained an exclusionary right required for Article III standing.  Appellant Br. 12, 35.[4]  We agree.

A patent owner's retained right to sue is a strong indicator of an exclusionary right.  *Cf. Mann*, 604 F.3d at 1361 (recognizing that "the most important consideration" of the standing analysis involves "the nature and scope of any right to sue purportedly retained by the licensor").  A right to royalties, while not itself an exclusionary right, can further evidence an exclusionary right, particularly when paired with other provisions that "involve the ability to exclude others from practicing an invention."  *Lone Star*, 925 F.3d at 1234; *see id.* (identifying Plaintiff's right to "collect royalties" as among the reasons it had Article III standing).  Moreover, a patent owner's sublicensing veto rights, even if not to be unreasonably withheld, reflect "substantial ongoing control" such that the licensee cannot sublicense free of the owner's interests.  *Propat Int'l Corp. v. Rpost, Inc.*, 473 F.3d 1187, 1191 (Fed. Cir. 2007); *see also Lone Star*, 925 F.3d at 1232–33 (reasoning that licensor's transfer veto, not to be unreasonably withheld, ensured that licensor had control over how the patents were asserted).  Taken together, these rights satisfy constitutional standing.

In this case, Plaintiff retains a sublicensing veto that (while it must be reasonably exercised) prevents Ingevity

---

[4]    In the alternative, Plaintiff argues that their allegations of monetary harm independently satisfy the constitutional injury-in-fact requirement.  Appellant Br. 25–27.  Because we conclude that Plaintiff retains an exclusionary right sufficient for constitutional standing, we need not reach this issue.

from granting sublicenses absent Plaintiff's consent or free of Plaintiff's royalty interest. *See* J.A. 81, ¶ 2.3. That consent right over sublicensing helps preserve Plaintiff's exclusionary interest because it prevents the licensee from unilaterally authorizing an accused infringer's practice of the patents without Plaintiff's approval and royalty interests. Moreover, "infringement would amount to an invasion of [Plaintiff's] legally protected interest" in the patents because it deprives it of royalties to which it is entitled as a patent owner. *Zebra Techs.*, 101 F.4th at 813. Plaintiff's right to sue, right to veto sublicenses, and royalty interests confirm that Plaintiff retains an exclusionary right, establishing that Plaintiff retains a concrete stake in excluding unauthorized practice of the patents and a mechanism to enforce that interest. *See* J.A. 87–88, ¶¶ 5.1–5.2; *id.* at 83–84, ¶ 3.1; *see also Zebra Techs.*, 101 F. 4th at 816 (acknowledging a patent owner's right to sue in *Mann* as supporting a retained exclusionary right). Plaintiff has, thus, demonstrated a concrete injury in fact sufficient to confer constitutional standing.

Indeed, Plaintiff's retained rights mirror those that we considered in *Mann*. *See* 604 F.3d at 1357–58. In *Mann*, the patent owner retained certain rights under the licensing agreement, including a secondary right to sue (should the licensee elect not to file an infringement action), entitlement to royalties, and veto authority over sublicenses. *Id.* Its standing was not defeated even when it granted to the licensee the exclusive rights to use, make, and sell the patented invention; the first right to sue; and the right to sublicense—rights that are granted to Ingevity as well. *See id.*; J.A. 81, ¶ 2.1.[5] Here, Plaintiff retains analogous rights,

---

[5]    None of Defendant's attempts to factually distinguish *Mann* are persuasive. *See* Appellee Br. 47–50. First, that Ingevity holds the exclusive right to sublicense is not dispositive because that right is constrained by Plaintiff's

including a right to sue, *see* J.A. 87–88, ¶¶ 5.1–5.2, royalty interests, *see id.* at 83–84, ¶ 3.1, and veto authority over sublicenses, *see id.* at 81, ¶ 2.3. *Mann*'s analysis of whether the patent owner's enforcement right was illusory under analogous facts supports the conclusion that Plaintiff's retained rights are similarly non-illusory here. *Mann* thus informs, though does not dictate, our analysis of constitutional standing here.

As explained above, Defendant and the district court erred in treating *Mann* as limited to statutory standing. *See* Appellee Br. 47–48; *Decision*, 2024 WL 5276676, at *7. While the *Mann* court applied the "all substantial rights" analysis for statutory standing, we later on in *Zebra Technologies* expressly cited the facts of *Mann* to support our constitutional standing analysis there. 101 F.4th at 816 (citing *Mann*, 604 F.3d at 1361). That reliance confirms that *Mann* is also relevant for analyzing constitutional standing.[6]

Defendant and the district court instead rely on *Morrow* to argue that Plaintiff's right to sue does not confer constitutional standing. Appellee Br. 45; *Decision*, 2024 WL 5276676, at *6. But *Morrow* is distinguishable. In *Morrow*, this court held that the plaintiff's right to sue for infringement was not, in that case, an exclusionary

---

veto rights and royalty interests. Second, although Ingevity retains all proceeds from litigation that it initiates on its own, Plaintiff retains the right to join in any litigation at the outset, and thereby continues to exercise meaningful control over the enforcement mechanism.

[6]    We do not hold that any party with statutory standing necessarily satisfies Article III, or that the "all substantial rights" test governs the constitutional inquiry; rather, we look to *Mann* only for its analysis of whether the licensee's powers rendered the patent owner's retained enforcement interest illusory.

right sufficient for constitutional standing.  499 F.3d at 1342–43.  But, unlike the Plaintiff here, the plaintiff in *Morrow* did not own the patent; its right to sue was contractually separated from patent ownership and *all* other underlying patent rights—the rights to make, use, or sell the patented invention, to license and sublicense the patent, *and* collect royalties from it—which were held by a different party.  *Id.* at 1336, 1338.  That is, the plaintiff possessed *only* a bare right to sue.[7]

Importantly, the plaintiff's right to sue in *Morrow* was "illusory" because the patent owner there could moot any suit brought by the plaintiff by granting a royalty-free sublicense to the accused infringer.  *Cf. Mann*, 604 F.3d at 1362.  In *Mann*, this court explained that the patent owner's right to sue in that case was not illusory in light of its retained royalty interests in any sublicenses.  *Id.*  That is, the patent owner retained the right to exclude parties from practicing the patent unless they compensated the patent owner as demanded.  We also distinguished *Speedplay, Inc. v. Bebop, Inc.*, where "we held that a licensee's right to grant royalty-free sublicenses to defendants

---

[7]   *Morrow* is also distinguishable because it addressed a licensee's standing.  We have noted that, in some instances, the "licensee-versus-patentee distinction" may be "critical."  *Zebra Techs.*, 101 F.4th at 816.  In *Zebra Technologies*, this court explained that specific inquiries for understanding whether a *licensee* was granted an exclusionary right—such as whether another entity possessed the right to license—"do not provide a reasonable proxy for understanding whether a *patent owner* retains at least one exclusionary right."  *Id.*  Here, that a licensee (Ingevity) has certain rights, including the shared right to sue on the patents, does not foreclose the possibility that Plaintiff retains at least one exclusionary right as the patent owner.

14 A.L.M. HOLDING COMPANY v. ZYDEX INDUSTRIES PRIVATE LTD.

sued by the licensor rendered illusory the licensor's right to sue." *Mann*, 604 F.3d at 1362 (citing 211 F.3d at 1251). The licensee's right to sublicense in *Mann*, in contrast, did not extinguish the patent owner's right to sue because any sublicense grants must pay "specified pass-through royalties" to the patent owner. *Id.*

Here, as in *Mann*, Ingevity's sublicensing right is constrained in a manner that preserves Plaintiff's right to sue. Plaintiff may withhold consent to Ingevity's sublicenses and is entitled to collect royalties from Ingevity and any sublicensees. J.A. 81, ¶ 2.3.[8] Because Ingevity cannot sublicense the patent free from Plaintiff's consent and royalty interests, Plaintiff's retained right to sue is not illusory.

Defendant contends that Plaintiff's right to sue is not an exclusionary right because they cannot end a lawsuit by granting a license. Appellee Br. 45–46. But the ability to sublicense is not the only means by which Plaintiff could settle litigation. Plaintiff may also settle suits through monetary payment and an agreement by an accused infringer to cease practicing the patents. *See* J.A. 87–88, ¶ 5.2 (providing that the "Prosecuting Party will control the conduct of the legal action"). Thus, even in light of

---

[8]    Defendant's contention that Plaintiff lacks any right to receive any royalties from sublicensees because they receive royalties exclusively from Ingevity is unpersuasive. *See* Appellee Br. 40. The Agreement expressly provides that "[s]ales made by a sublicensee shall be reported and royalty paid to [Plaintiff] as if [Ingevity] had made such sale." J.A. 81, ¶ 2.3. Further, if Ingevity fails to pay the pass-through royalties, then Plaintiff may terminate the Agreement and any sublicenses. *Id.* at 90, ¶ 9.3 (providing for termination upon material breach by Ingevity); *id.* at 81, ¶ 2.3 ("Upon any termination of this Agreement . . . all sublicensee rights shall also terminate.").

Ingevity's sublicensing rights, Plaintiff retains a meaningful ability to settle the lawsuits they initiate.

On these facts, Plaintiff retained an exclusionary right sufficient for Article III standing, namely the non-illusory right to sue that their licensee, Ingevity, could not nullify through unilateral, royalty-free sublicensing.  The district court's contrary holding set too demanding a threshold for the "irreducible constitutional minimum of standing."  *See Lujan*, 504 U.S. at 560; *Lexmark*, 572 U.S. at 125.

## CONCLUSION

Plaintiff retained at least an exclusionary right after their transfer of rights to Ingevity under the Agreement. Because Plaintiff has constitutional standing, we reverse and remand.

## REVERSED AND REMANDED

### COSTS

Costs to Appellant.